IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| CITY OF WACO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 6:15-CV-310  RP |
| | § | |
| KLEINFELDER CENTRAL, INC., | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court are Defendant's Motion for Summary Judgment (Dkt. 23), Plaintiff's Motion for Summary Judgment and Motion to Dismiss (Dkt. 25), the parties responses to those motions, and Defendant Kleinfelder Central, Inc.'s reply to the City of Waco's response. In addition, Defendant Kleinfelder Central, Inc. ("Defendant" or "Kleinfelder") has filed three motions regarding evidence or expert testimony that Plaintiff City of Waco ("Plaintiff" or "the City") submitted with its summary judgment motion (Dkts. 26, 27, 32), the City has filed three responses to those motions, and the Defendant has filed two replies. After reviewing each of these filings, the relevant case law, and the record in this case, the Court issues the following order.

## I. BACKGROUND

During the 1950s and 60s, a company called Southwest Chemical and Spraying mixed toxic chemicals in a concrete pit in a building located on a five acre parcel of land in downtown Waco, at the Northeast intersection of Interstate Highway 35 and Martin Luther King, Jr. Boulevard ("the Property"). (Compl. ¶¶ 5–6, Dkt. 17; Def.'s Mot. for Summ. J. at 6, Dkt. 23). At some point, this concrete pit cracked, allowing toxic chemicals to leach into the soil below. (Def.'s Mot. to Dismiss at 6, Dkt. 23). On September 4, 2007, the City of Waco took title to the property through a foreclosure

for unpaid property taxes, as trustee for itself, Waco Independent School District, and McLennan County. (Compl. ¶ 7, Dkt. 17; Def.'s Mot. for Summary J. at 2, Dkt. 23).

On November 2, 2010, the City entered a Contract for Architect/Engineering Services ("the Agreement") with Kleinfelder for the remediation of the Property. (Pl.'s Mot. for Summ. J. at 4, Dkt. 25; Def.'s Mot. for Summ. J. at 6, Dkt. 23). Under the Agreement, Kleinfelder was to provide environmental services, including collecting samples from the Property to help the City determine the extent and nature of the soil contamination, and monitoring the later remediation activities. (Def.'s Mot. for Summ. J. at 7 & Ex. 1 at 19; Dkts. 23, 23-3). Kleinfelder's services also included providing analytical laboratory results to the City supporting classification of the collected soil as Hazardous, Class 1 Non-Hazardous, and Class-2 Non-Hazardous. (Def.'s Mot. for Summ. J. at 7; Pl.'s Mot. for Summ. J. at 4–5, Dkt. 25).

Excavation of soil from the Property began in mid-November of 2012. (Pl.'s Mot for Summ. J. at 8; Dkt. 25). The soil was transported to a staging area at the City of Waco's landfill, located on Old McGregor Road. (Def.'s Mot. for Summ. J. at 7–8; Dkt. 23). Only soil classified as Class 2 Non-Hazardous can be disposed of at the City landfill, but sometime later it became clear that much of the soil being moved to the staging area was either Class 1 Non-Hazardous or Hazardous. (Def.'s Mot. for Summ. J. at 12; Dkt. 23; Pl.'s Mot. for Summ. J. at 9, Dkt. 25). Extensive cleanup of the City landfill was required to remove any soil excavated from the Property that was not classified as Class 2 Non-Hazardous. (Def.'s Mot. for Summ. J. at 12; Dkt. 23; Pl.'s Mot. for Summ. J. at 11–12, Dkt. 25).

The City filed suit against Kleinfelder on October 26, 2015, alleging that Kleinfelder failed to properly perform its obligations under the Agreement, including obligations outlined in a Sampling and Analysis Plan ("the SAP") that the City asserts was an amendment to the Agreement, leading to the deposit of contaminated soil at the City landfill and resulting in the additional costs of cleaning

up that contamination. The City brings claims for breach of contract and negligence against Kleinfelder and seeks approximately $1.1 million in damages. Kleinfelder brings a counterclaim for declaratory judgment, seeking that the Court declare that the SAP is not part of the Agreement and that the damages sought by the City are precluded by the Agreement.

The parties have filed cross-motions for summary judgment on the pending claims.[1] In support of its motion for summary judgment, Kleinfelder makes three primary arguments: (1) the Agreement provides that the City has full and complete responsibility for all costs related to handling, transportation, and disposal of contaminated materials, and thus cannot recover those costs from Kleinfelder; (2) the Agreement allocated all damages associated with transport, handling, management, and disposal of the contaminated materials; and (3) the City's negligence claim is in reality a claim for non-performance under the Agreement, and is therefore barred by Texas law.

The City, in support of its motion for summary judgment argues: (1) that it is entitled to summary judgment on its breach of contract claim because the SAP is a valid and enforceable part of the Agreement between the City and Kleinfelder, the City fully performed under the Agreement, Defendant breached the Agreement by failing to perform its monitoring, sampling, and screening duties, the City's damages were the natural, probable, and foreseeable consequence of Kleinfelder's breach, and the City's damages are general or direct damages and not precluded under the Agreement as consequential damages; and (2) that the City is entitled to a dismissal of Kleinfelder's declaratory judgment.

The parties each filed a response to the other's motion for summary judgment, and Kleinfelder also filed a reply to the City's response to Kleinfelder's motion for summary judgment. In addition to addressing the arguments for summary judgment, both parties' responses included objections to the evidence relied on by the opposing party's motion for summary judgment. Further,

---

[1] Plaintiff did not seek summary judgment on its negligence claim. (Pl.'s Mot. for Summ. J., Dkt. 25).

Kleinfelder filed three separate motions regarding summary judgment evidence, a Motion to Exclude Opinion Testimony of Plaintiff's Expert Michael W. McLaughlin (Dkt. 26), a Motion to Exclude Opinion Testimony of Plaintiff's Expert Edward Kavaznjian, Jr. (Dkt. 27), and a Motion to Exclude Portions of the City's Summary Judgment Evidence (Dkt. 32).

With this as background, the Court will turn first to Defendant's motion for summary judgment, and then address Plaintiff's. During this discussion, the Court will address the parties' evidentiary objections to the extent they are relevant to the Court's rulings on summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could

find for the non-movant, summary judgment will be granted." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view this evidence in the light most favorable to the non-movant, *Rosado v. Deters*, 5 F.3d 119, 122 (5th Cir. 1993), and should "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## A. Defendant's Motion for Summary Judgment

First, Defendant argues it is entitled to summary judgment on Plaintiff's breach of contract claim because the Agreement allocates responsibility for all costs the City now seeks as damages to the City. Second, Defendant argues that it is entitled to summary judgment on Plaintiff's negligence claim because it is, in reality, a claim for non-performance under the Agreement, and is barred by Texas law. The Court will address each of these arguments in turn.

*1. Allocation of Liability Under the Agreement*

The Agreement between the parties, signed by the City on November 2, 2010, incorporates fully the terms and conditions attached in an attached document marked Exhibit A. (Contract for Architect/Engineering Servs. ¶ 2.1, Dkt. 23-3). In Section 25 of Exhibit A, entitled "Warranty of Title, Waste Ownership," the Agreement provides:

> [Kleinfelder] will not take title to any hazardous materials found at the project site. Any risk of loss with respect to all materials shall remain with the project site owner, who shall be considered the generator of such materials, execute all manifests as the generator of such materials, and be liable for the arrangement, transportation, treatment, and/or disposal of all material. All samples shall remain the property of the City. The City shall promptly, at its cost, remove and lawfully dispose of samples, cuttings, and hazardous materials.

5

(Exhibit A ¶ 25, Dkt. 23-3). The Agreement also incorporates a document entitled "Scope of Services" as Exhibit C. (Contract for Architect/Engineering Servs. ¶ 1.1, Dkt. 23-3). Under a portion of Exhibit C entitled "Limitations," the Agreement provides:

> During the course of the performance of Kleinfelder's services, hazardous materials may be discovered. Kleinfelder will assume no responsibility or liability whatsoever for any expense, claim, loss of property value, damage, or injury that results from or in any way connected with pre-existing hazardous materials being encountered or present on the project site, or from the discovery of such hazardous materials. Notwithstanding anything contained in this proposal to the contrary, Kleinfelder shall not assume the status of an owner, operator, generator, or person who arranges for disposal, transport, storage or treatment of hazardous materials within the meaning of any governmental statute, regulation or order. Our Client will be solely responsible for notifying all governmental agencies, and the public at large, of the existence, release, treatment or disposal of any hazardous materials observed at the project site, either before or during performance of Kleinfelder's services.
>
> Our Client will be responsible for all arrangements to lawfully store, treat, recycle, dispose, or otherwise handle hazardous materials, including cuttings and samples resulting from Kleinfelder's services.

(Exhibit C at 5–6, Dkt. 23-3).

Defendant argues that these two provisions indicate that the City is responsible for any risk of loss with respect to the contaminated materials, and that the City is liable for all costs related to transportation and disposal of contaminated material from the Property. Defendant further asserts that because all damages now sought by Plaintiff stem from the costs of removing the contaminated soil from the City landfill, transporting, and disposing of it, Plaintiff is precluded from seeking those damages under the Agreement.

In the alternative, Defendant argues that the damages sought by Plaintiff are consequential damages, and that such damages are waived under the Agreement. In Section 24 of Exhibit A, entitled "Waiver of Consequential Damages," the Agreement provides:

> Neither party shall be liable to the other for consequential damages, including but not limited to loss of profits, loss of use, incidental, indirect, collateral, punitive, exemplary, multiple or other special damages.

(Exhibit A ¶ 24, Dkt. 23-3).

Plaintiff responds that Defendant's interpretation of Section 25 and the "Limitations" language in Exhibit C would effectively act as a pre-breach release of Defendant's failure to perform under the Agreement and would render the Agreement illusory. According to Plaintiff, these provisions were intended to set forth the parties' respective liability with respect to third-parties and to address certain regulatory liabilities of the parties. Further, Plaintiff argues that neither provision precludes Defendant's liability in this case. Finally, Plaintiff argues that Defendant's only evidence in support of its argument regarding the waiver of consequential damages is inadmissible, and that in any event Plaintiff's damages are direct damages, not consequential damages, and thus not subject to the Agreement's waiver.

Under Texas law,[2] the primary concern of the court in construing a written contract is to determine the parties' intentions as expressed in the document. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004); *see also Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). "To achieve this objective, [the] court[] should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original). The contract should be construed "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and '[to]avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). Terms within the contract should be given their plain, ordinary meaning unless the contract itself indicates that the parties intended for a particular term to have a different meaning. *Gonzalez*, 394 F.3d at 392. "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous" and courts are to construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312.

---

[2] The parties, and the Agreement's choice of law provision, indicate that Texas law applies in this case.

*a. Section 25 and Exhibit C "Limitations"*

In this case, the parties urge the Court to follow two different guiding principles in construing Section 25 and the "Limitations" language in Exhibit C of the Agreement. Defendant argues that here, the principle of freedom to contract should guide the Court's reasoning. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 811–12 (Tex. 2012). ("We have 'long recognized Texas' strong public policy in favor of preserving the freedom of contract.' . . . 'Freedom of contract allows parties to . . . allocate risk as they see fit.'"). Defendant asserts that it is ultimately irrelevant whether or not the damages caused by the removal of Class 1 Non-Hazardous and Hazardous soil being removed to the City landfill were Defendant's fault or not because the parties allocated all the risk associated with the contaminated soil to the City.

Plaintiff argues that Defendant's interpretation would render the Agreement illusory, and that the relevant provisions should not be construed to release Defendant from its obligations under the Agreement. Plaintiff explains that the provisions cited by Defendant are primarily for purposes of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). 42 U.S.C. § 9607(a). As Plaintiff notes, CERCLA was enacted by Congress "as a broad remedial measure aimed at assuring 'that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.'" *Uniroyal Chem. Co. v. Deltech Corp.,* 160 F.3d 238, 242 (5th Cir. 1998), *as modified on reh'g* (Jan. 8, 1999) (quoting S. Rep. No. 96-848, at 13 (1980)). CERCLA imposes on those considered owners and operators of facilities containing a hazardous substance, and those who transport hazardous substances, a wide range of damages, including the loss of natural resources and the costs of any health assessment studies, under CERCLA. *See* 42 U.S.C. § 9607(a). Plaintiff argues that Section 25 and the "Limitations" provision in

Exhibit C were intended to limit Defendant's liability under CERCLA, noting that the language of Exhibit C tracks approximately the language of CERCLA.[3]

In addition to arguing that an alternate, reasonable interpretation exists, Plaintiff argues that certain provisions in the Agreement would be rendered illusory using Defendant's interpretation. Defendant seems to admit this by essentially asserting that "It Does Not Matter" whether it was "Kleinfelder's Fault [or] Waco's Fault." (Def.'s Mot. for Summ. J. at 16–18, Dkt. 23). In other words, Defendant suggests that even if it did breach the Agreement by failing to perform its screening obligations, it cannot be held liable now.

Under Texas law, "when a purported bilateral contract is supported only by illusory promises, there is no contract." *Lizalde v. Vista Quality Markets*, 746 F.3d 222, 225 (5th Cir. 2014). "A promise is illusory if it does not bind the promisor." *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 239 (5th Cir. 2012) (quoting *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010)). Contracts should be interpreted to give effect to their provisions, however, rather than render them meaningless or illusory. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (Courts should "give effect to all the provisions of the contract so that none will be rendered meaningless.").

Here Defendant promised, through the Agreement, to complete various services for the Plaintiff in exchange for compensation. These services were to include soil sampling and testing, monitoring of site remediation activities, and, if needed, perimeter air monitoring during remediation

---

[3] CERLA provides that the following persons face liability under the law:
    (1) the owner and operator of a vessel or a facility,
    (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
    (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
    (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance
42 U.S.C. § 9607.

activities. (Def.'s Mot. for Summ. J. Ex. 1, Ex. C at 4, Dkt. 23-3). If Defendant could not be held liable for a failure to perform these services, Defendant's promises would be illusory or meaningless.

Defendant makes two main arguments in response to Plaintiff's interpretation of the Agreement. First, Defendant argues that the provisions at issue make clear who bears to risk of loss for transporting and disposing of the materials. But Defendant's argument confuses what Plaintiff alleges Defendant is liable for—breaching the Agreement by failing to properly screen soil and monitor remediation at the Property—with what Plaintiff alleges is the appropriate measure of damages for Defendant's liability—the cost Plaintiff incurred in cleaning-up the contaminated soil. While the Agreement makes clear the Plaintiff is responsible and for all costs associated with the contaminated soil, it does not speak to Defendant's possible liability for their alleged breach of the Agreement by not properly screening soil at the Property.

Second, Defendant argues that "[t]he City is an extremely sophisticated and experienced purchaser of consulting services and, in particular, environmental consulting services," that "[t]he City has its own in-house legal department," and that the City "knows how to allocate potential liability in a contract for environmental services." (Def.'s Reply at 4–5, Dkt. 35). But this argument cuts both ways. If Kleinfelder and the City—both of whom are experienced in contracts of this nature—truly intended to waive all potential liability for Kleinfelder if it failed to perform its monitoring and screening obligations under the agreement, they certainly could have written a contract that clearly did so.

While the Court recognizes the parties' freedom to contract, it finds that only Plaintiff has supplied a reasonable interpretation of the provisions at issue and that it should be adopted. For the foregoing reasons, the Court finds that Section 25 and Exhibit C of the Agreement do not preclude Defendant's liability in this case, and denies Defendant's motion for summary judgment.

*b. Waiver of Consequential Damages*

The Court turns next to Defendant's argument that Plaintiff's claims for damages are precluded by the waiver of consequential damages at Section 24 of Exhibit A in the Agreement. The Agreement itself does not define "consequential damages," but does provide that consequential damages include, but are not limited "to loss of profits, loss of use, incidental, indirect, collateral, punitive, exemplary, multiple or other special damages." (Exhibit A ¶ 24, Dkt. 23-3).

Under Texas common law,[4] actual damages from a breach of contract may be classified as either "direct" or "consequential." *See Cherokee Cty. Cogeneration Partners, L.P. v. Dynegy Marketing & Trade*, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Direct damages . . . flow naturally and necessarily from a defendant's wrongful act, [and] compensate the plaintiff for a loss that is conclusively presumed to have been foreseen by the defendant as a usual and necessary consequence of its wrongdoing." *Id.* "By contrast, consequential damages 'result naturally, but not necessarily, from the defendant's wrongful acts.'" *Id.* (quoting *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998)).

Defendant argues that it is entitled to summary judgment on Plaintiff's breach of contract claim because the damages Plaintiff complains of—the costs of removing contaminated soil from the City landfill—are consequential, and were indirect or not forseeable as a consequence of its wrongdoing. Defendant supplies as evidence for its motion for summary judgment the statement of Charles Dowdell, Plaintiff's designated expert on damages, who stated that there was "an indirect relationship" between the breach alleged by the City and the damages sought by the City. (Dowdell Dep. 290:5–9, Dkt. 23-7).

---

[4] Because the parties did not define the term "consequential damages" within the Agreement, and the examples of consequential damages provided in the Agreement are consistent with Texas common law, the Court will presume the parties intended the term to have its ordinary meaning under Texas common law. *See Cherokee Cty. Cogeneration Partners, L.P. v. Dynegy Marketing & Trade*, 305 S.W.3d 309, 313–14 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Plaintiff responds that this testimony is inadmissible as a matter of law under both Texas and Federal evidentiary rules, and instead argues that the evidence demonstrates that the damages it seeks are direct, not consequential damages. Plaintiff cites to the SAP, the Texas Commission on Environmental Quality Response Action Plan, deposition testimony of Defendant's Project Manager, Winfield McAtee, and deposition testimony of Plaintiff's experts[5] to show that the Defendant contemplated the very harm that occurred here—contaminated soil being sent to the wrong facility, that had to be removed later and sent to another facility.

Defendant rebuts this evidence in its reply, again citing the City's damages expert, arguing that if the City had complied with its obligations under the SAP by stockpiling soil at the Property and waiting to receive test results before moving the contaminated soil to the City landfill, the damages would have been prevented, and thus those damages were not the direct result of Defendant's actions.

In light of this competing evidence, the Court finds that a genuine issue of material fact exists regarding whether the damages sought by the City are consequential damages, and thus precluded under the Agreement. Because the Court cannot resolve the issue on summary judgment, Defendant's motion for summary judgment is denied to the extent it is based on Section 24 of Exhibit A of the Agreement.

### 2. Plaintiff's Negligence Claim

Defendant seeks dismissal of Plaintiff's negligence claim on the basis that the Plaintiff's tort claim arises from a breach of contract and is thus precluded by law. The Court agrees. The Texas Supreme Court has "repeatedly" made clear that when the injury complained of is one for economic damages recoverable under a breach of contract claim, an action for the same injury or loss in tort is precluded. *See LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 242 n.35 (Tex. 2014).

---

[5] Defendant has objected to Plaintiff's use of one of these experts, Edward Kavaznjian, Jr. (*See* Motion to Exclude Opinion Testimony of Plaintiff's Expert Edward Kavaznjian, Jr., Dkt. 27).

Plaintiff's argument that its claims are based on "the quality of Defendant's performance [under the Agreement], as opposed to the complete failure to perform," are thus unavailing. (Pl.'s Resp. at 38, Dkt. 30). In either case, Plaintiff seeks to recover an injury or loss that was the subject of the Agreement itself, and its "action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).[6] The Court therefore grants Defendant's motion for summary judgment with respect to Plaintiff's negligence claim.

## B. Plaintiff's Motion for Summary Judgment

Plaintiff argues that it is entitled to summary judgment on its breach of contract claim, arguing that it is undisputed that Defendant's breached the Agreement by failing to perform the monitoring and sampling services they were obligated to perform under the Agreement. Plaintiff also argues that it is entitled to summary judgment on Defendant's declaratory judgment claim. The Court will address each of these arguments in turn.

### 1. Breach of Contract

The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 767 (5th Cir. 2016). "A breach occurs when a party fails to perform a duty required by the contract." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

The City argues that it is entitled to summary judgment on its breach of contract claim because the SAP is a valid and enforceable part of the Agreement between the City and Kleinfelder, the City fully performed under the Agreement, Defendant breached the Agreement by failing to

---

[6] The Texas Supreme Court has limited the line of cases on which Plaintiff relies for its argument. *See LAN/STV*, 435 S.W.3d at 242 n.35. Notably, two of the cases on which Plaintiff relies include tort claims stemming from a harm that is not premised on the defendant's obligation under the contract. *See Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947) (defendant burned down plaintiff's home); *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (defendant flooded plaintiff's home).

perform its monitoring, sampling, and screening duties as indicated in the SAP, and the City's damages were the natural, probable, and foreseeable consequence of Kleinfelder's breach.

Defendant responds that summary judgment is precluded because genuine issues of material fact remain regarding whether the SAP was incorporated into the Agreement, whether the City of Waco performed its obligations under the Agreement, whether Defendant's actions constituted a material breach, and whether the City's damages were the natural, probable, and foreseeable consequences of that breach.[7]

After thoroughly reviewing the factual allegations made by each party, the Court agrees with Defendant. The parties vigorously contest many of the facts surrounding the dispute, including whether the parties intended to incorporate the SAP into the Agreement (as part of an Amendment executed on November 28, 2012 or otherwise), why the City decided to stage soil removed from the Property at the City landfill, whether the City knew that a photoionization detector ("PID") was not being used to monitor the excavation, how a PID works, and whether Defendant was appropriately monitoring the soil excavation for odor or for visual indications that it might be hazardous. Because the Court finds that Plaintiff has failed to demonstrate that there is no genuine dispute as to issues of material fact, the Court must deny Plaintiff's motion for summary judgment with respect to the breach of contract claim.

*2. Defendant's Declaratory Judgment Claim*

Plaintiff argues that under both Texas and Fifth Circuit case law, a request for declaratory judgment that merely restates a party's defenses, without more, is insufficient and should be dismissed.[8] Defendant counters that an actual controversy between the parties exists, and that its counterclaim is sufficient to state a claim pursuant to the Declaratory Judgment Act, 28 U.S.C.

---

[7] Both parties also address whether Plaintiff's damages are precluded under the Agreement as consequential damages. The Court has already addressed this issue in considering Defendant's motion for summary judgment. *See supra* Part II(A)(1)(b).

[8] Plaintiff has filed this part of its motion as a motion to dismiss, rather than as a motion for summary judgment.

§ 2201. Further, it argues that courts routinely allow parties to seek declaratory judgments regarding their rights and obligations pursuant to a contract.

The Declaratory Judgment Act confers "substantial discretion" on courts "in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). While the Court agrees with Defendant that courts are generally amenable to declaratory judgment actions when a party seeks to obtain a declaration of its rights under contract, here such a declaration is unnecessary because Plaintiff has already placed the issues relevant to Defendant's counterclaim before the Court. *See Madry v. Fina Oil & Chem. Co.*, 44 F.3d 1004 (5th Cir. 1994) (reversing district court's grant of declaratory judgment because "[t]he declaratory judgment [did] not declare any significant rights not already at issue in the contract dispute."); *see also Regus Mgmt. Grp., LLC, v. Int'l Bus. Mach. Corp.*, No. CIV.A.3:07-CV-1799-B, 2008 WL 2434245, at *2 (N.D. Tex. June 17, 2008) ("[C]ourts regularly reject declaratory judgment claims that seek resolution of matters that will already be resolved as part of the claims in the lawsuit."). Thus, the Court grants Plaintiff's motion to dismiss with respect to Defendant's counterclaim for a declaratory judgment.

## III. REMAINING EVIDENTIARY MOTIONS

Having addressed each parties' motions for summary judgment, the Court now turns to Defendant's three separately filed motions regarding the summary judgment evidence—two motions to exclude the opinion testimony of Plaintiff's experts and one general objection and motion to strike portions of the City's motion for summary judgment.

### A. Motions to Exclude Expert Testimony

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. This rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

15

(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 has been amended to incorporate the principles first articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and as well as those enunciated in the many cases applying *Daubert*, including *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). *See* Fed. R. Evid. 702 Advisory Committee Notes.

Following *Daubert* and its progeny, trial courts are to act as "gatekeepers," overseeing the admission of scientific and nonscientific expert testimony. S*ee Kumho Tire Co.*, 526 U.S. at 147. Trial courts must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. In carrying out this task, district courts have broad latitude in weighing the reliability of expert testimony for admissibility. *See Kumho Tire Co.*, 526 U.S. at 152 (recognizing trial court must have considerable leeway in determining admissibility of expert testimony). The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method and are reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

However, Rule 702 is not the only evidentiary barrier to the admissibility of expert testimony—Rule 403 "permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 403).

*1. Plaintiff's Expert Michael W. McLaughlin*

Plaintiff's Expert Michael McLaughlin's report draws two broad conclusions. First, that the SAP was part of the Response Action Plan ("RAP") expressly required by the Agreement, and second, that the screening techniques described in the SAP likely would have assisted in segregating soils that appeared inconsistent with Class 2 Non-Hazardous waste. Defendant seeks to exclude McLaughlin's testimony regarding each of these conclusions.

The Court agrees with Defendant that McLaughlin should not be permitted to testify before a jury regarding his first conclusion. The questions left to the jury with respect to whether the SAP is incorporated into the Agreement are fact issues which largely on the parties' intent regarding the Agreement, the Amendment, and the SAP. While the Court acknowledges that McLaughlin, a lawyer, has not *expressly* proffered legal opinions in his expert report, it also concludes that the probative value of his testimony—which primarily turns on his view that the SAP was a fundamental part of the RAP—is minimal. His opinions with respect to this issue are based solely on reviewing the very same documents that the jury will have access to and his experience working on similar projects in other states. These documents are not highly technical, and to the extent that Plaintiff wishes to demonstrate the importance of the SAP to the RAP, it may do so with lay witnesses.

In contrast, the Court finds that the danger of unfair prejudice or confusion of the jury in this case would be substantial if McLaughlin were allowed to testify on this issue. Legal opinions are not the proper subject of expert testimony, *see, e.g.*, *Askanase v. Fatjo*, 130 F.3d 657, 672–73 (5th Cir. 1997), and McLaughlin comes dangerously close to expressing a legal opinion when he asserts that the SAP "was an element of" the RAP required under the Agreement. (Pl.'s Resp. to Def.'s Mot. to Exclude McLaughlin, Ex. C at 5, Dkt. 40). Juries are very susceptible to adopting expert opinions, *see Askanase*, 130 F.3d at 673, and the Court finds it likely that a jury in this case would be unduly persuaded by McLaughlin's testimony. The Court therefore concludes that McLaughlin's testimony

as to the relationship between the SAP and the RAP, or whether the SAP is incorporated into the Agreement, should be excluded under Federal Rule of Evidence 403.

The Court next turns to Defendant's objections regarding McLaughlin's testimony on soil screening methods, including those referenced in the SAP. McLaughlin is a professional engineer in Virginia and New Mexico with a degree in civil engineering. (Pl.'s Resp. to Def.'s Mot. to Exclude McLaughlin, Ex. A at 9, Dkt. 40). His resume lists scores of different Superfund Projects, Resource Conservation and Recovery Act Projects, Voluntary Cleanup Projects, and Environmental Due Diligence Assignments. (*Id.* at 9–15). He has also written extensively about landfills and solid waste management. (*Id.* at 15–16). In addition, McLaughlin's deposition testimony demonstrates his familiarity with different soil screening methods, including a PID and exactly how it works. (*See generally* Pl.'s Resp. to Def.'s Mot. to Exclude McLaughlin, Ex. B).

McLaughlin's report explains the results of an evaluation of the soil staged at the landfill done by his engineering firm. (Pl.'s Resp. to Def.'s Mot. to Exclude McLaughlin, Ex. C at 5–6, Ex. 40). He explains that most of the analysis was done with a flame ionization detector ("FID") rather than a PID, and in his report and his deposition he explains the difference between the two devices. (Pl.'s Resp. to Def.'s Mot. to Exclude McLaughlin, Ex. B at 57–58 & Ex. C at 5–6, Ex. 40). Within his report, McLaughlin also explains the basis for his opinions regarding what a PID would have detected had it been used at the Property. (Pl.'s Resp. to Def.'s Mot. to Exclude McLaughlin, Ex. C at 6, Ex. 40).

Defendant offers several reasons to exclude McLaughlin as an expert. While many of these arguments may weigh against certifying McLaughlin as an expert (such as that he is not a professional engineer in Texas, and that he relies on no peer-reviewed articles for his opinions), they do not overcome his vast knowledge and experience in soil screening, the matter on which he is testifying.

Defendant also argues that a critical conclusion made by McLaughlin—that a PID could have been used to detect volatile organic compounds in the air at the Property that would have indicated that the subject soil was contaminated—is unreliable. In support of this argument, Defendant primarily points to a statement made in a report by a colleague of McLaughlin's who tested the subject soil. That colleague stated that while "[t]he PID was working normally [it] was not used because it did not have sufficient power to ionize the target gases." (McLaughlin Dep. 102:7–23, Dkt. 26-1). It is unclear to the Court whether this is statement is based on the colleague's attempted used of a PID, or instead, based on the colleague's own conclusion that a PID would be insufficient. In either case, however, the Court concludes that this issue can be adequately addressed on cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Thus, for largely the reasons stated in Plaintiff's response, the Court denies Defendant's motion to exclude McLaughlin's testimony regarding soil screening.

*2. Plaintiff's Expert Edward Kavazanjian, Jr.*

Defendant also challenges the testimony of Plaintiff's expert Edward Kavazanjian, Jr. Kavazanjian is a "Consulting Geotechnical Engineer," with a Ph.D. in Civil/Geotechnical Engineering from Berkeley, a Masters in Civil/Geotechnical Engineering from MIT, and a Bachelor of engineering from MIT. (Pl.'s Resp. to Def.'s Mot. to Exclude Kavazanjian, Ex. A at 1, Dkt. 39). According to his curriculum vitae, he is "recognized for his work on mechanical properties of municipal solid waste, analysis and design of waste containment systems, and geotechnical earthquake engineering." (*Id.* at 2). Kavazanjian's curriculum vitae also includes an extensive list of publications and speeches, primarily related to these topics. (*Id.* at 5–32). Further, Kavazanjian's

deposition testimony indicates that he has used a PID and has a thorough understanding of how a PID works. (Kavazanjian Dep. at 21–27, Dkt. 39).

Defendant makes many of the same arguments with respect to Kavazanjian as it did with respect to McLaughlin. The Court finds that these arguments are similarly without merit with respect to Kavazanjian. For example, Defendant argues that because Kavazanjian is specialized in soils engineering, and is not a *chemist* nor an *instrumentation expert*, he is unqualified. However, within the same motion, Defendant also argues Kavazanjian is not qualified because he is not a *professional engineer in Texas.* (Def.'s Mot. to Exclude Kavazanjian at 1, 6). Generally, Rule 702 does not demand that an expert has a particular set of credentials in order to testify, but that the expert's testimony will assist the trier of fact and is reliable. While Kavazanjian is not a chemist, an instrument expert, nor a professional engineer in Texas, his extensive background in soils engineering and his deposition testimony regarding soil screening and how a PID works demonstrate his qualifications and knowledge.

Defendant also argues that Kavazanjian's opinions regarding the functioning and capabilities are incorrect. It bases this argument on Kavazanjian's failure to rely on peer-reviewed publications for his opinion, his lack of publications on the subject, and the fact that a PID was ultimately not used to screen the subject soil after it was thought to be contaminated. The Court concludes that these points are insufficient to demonstrate the Kavazanjian's opinion is unreliable. Again, to the extent that Defendant seeks to call into question Kavazanjian's opinions, it may do so by raising these issues on cross-examination. *See Daubert*, 509 U.S. at 596. Thus, the Court denies Defendant's motion to exclude Kavazanjian's testimony at trial.

### B. Objections and Motion to Strike Summary Judgment Evidence

Defendant also files objections to, and moves to strike, fifty-eight different statements in the factual background to Plaintiff's motion for summary judgment. Defendant objects to statements in

which Plaintiff quoted from Defendant's publically accessible website and others in which Plaintiff quoted the SAP (Def.'s Objs. to Pl.'s Summ. J. Evid. ¶¶ 1–4, 8, Dkt. 32). Defendant also objects to numerous other statements including those summarizing Plaintiff's factual allegations (*e.g.*, *id.* ¶ 6), and those supported by the testimony of Plaintiff's expert, to which Defendant has already objected (*e.g.*, *id.* ¶¶ 10–15). Defendant lists its objections without any explanation, including more than ten objections to single sentences included in Plaintiff's motion. The Court finds that the vast majority of these objections are meritless. However, because the Court denies Plaintiff's motion for summary judgment and agrees with Defendant that genuine issues of material fact exist regarding Plaintiff's breach of contract claim, it concludes that Defendant's objections to Plaintiff's summary judgment evidence are moot.

## IV. CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant's Motion for Summary Judgment on Plaintiff's claim for breach of contract and **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's negligence claim (Dkt. 23). Further, the Court **DENIES** Plaintiff's Motion for Summary Judgment on its claim for breach of contract, and **GRANTS** Plaintiff's Motion Dismiss on Defendant's claim for declaratory judgment (Dkt. 25).

In addition, the Court **GRANTS** in part and **DENIES** in part Defendant's Motion to Exclude Opinion Testimony of Plaintiff's Expert Michael W. McLaughlin (Dkt. 26), **DENIES** Defendant's Motion to Exclude Opinion Testimony of Plaintiff's Expert Edward Kavaznjian, Jr. (Dkt. 27), and **DENIES** Defendant's Motion to Exclude Portions of the City's Summary Judgment Evidence (Dkt. 32).

**SIGNED** on October 6, 2016.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE